

IN THE

# Court of Appeals of Indiana

North River Insurance Company and RiverStone Claims
Management LLC,

*Appellants-Defendants*

v.

Landis+Gyr Technology, Inc.,

*Appellee-Plaintiff*



FILED

May 13 2026, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

May 13, 2026

Court of Appeals Case No.
25A-PL-375

Appeal from the Tippecanoe Superior Court

The Honorable Randy J. Williams, Judge

Trial Court Cause No.
79D01-2107-PL-79

**Opinion by Judge Vaidik**
Judges Mathias and Pyle concur.

**Vaidik, Judge.**

## Case Summary

[1] Landis+Gyr Technology, Inc. ("Landis") sued North River Insurance Company and RiverStone Claims Management LLC seeking insurance coverage for remediation of pollution at a former manufacturing site. The trial court entered partial summary judgment for Landis, awarding it over $10,000,000. North River and RiverStone jointly appeal. We reverse and remand for the entry of summary judgment for North River and RiverStone on all of Landis's claims.

## Facts and Procedural History

[2] In the early 1950s, Duncan Electric Company, Inc., began manufacturing operations at 3601 Sagamore Parkway North in Lafayette ("the Lafayette Site"). Duncan used various solvents in those operations, including trichloroethylene ("TCE"). In 1976, Landis, a New York company with operations in multiple states and Canada, acquired Duncan.[1]

[3] That year and the next, North River issued three excess liability insurance policies to Landis. The first policy—covering February 5, 1976, through

---

[1] There have been many "Landis" entities involved in the 50-year history of this case, and the entities that acquired Duncan and bought the North River policies didn't have the name of the plaintiff/appellant here, "Landis+Gyr Technology, Inc." In fact, the parties dispute whether "Landis+Gyr Technology, Inc." is an insured under the policies and the proper plaintiff in this case. Because North River and RiverStone prevail on other grounds, we need not resolve this issue, and we use "Landis" throughout the opinion for ease of reference.

February 5, 1977—and the second policy—covering February 5, 1977, through October 1, 1977—provided limits of $7,000,000 per occurrence in excess of at least $1,000,000. The third policy—covering October 1, 1977, through October 20, 1978—provided limits of $5,000,000 per occurrence in excess of at least $1,000,000. The applications for the first two policies identified three insured premises: one in New York, one in California, and one in Canada. An endorsement to the third policy identified 11 named insureds and locations: five in New York, two in Indiana (including Duncan), two in Ohio, and one each in California and Florida.

[4]     The North River policies include the following provisions relevant to this appeal:

> **I COVERAGE**
>
> The Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, arising out of an occurrence or assumed by the insured under contract, for:
>
>> (a) Personal Injury Liability,
>>
>> (b) Property Damage Liability, or
>>
>> (c) Advertising Liability.

Appellants' App. Vol. 2 pp. 127, 145, 159. "Ultimate net loss" means "the total of the following sums with respect to each occurrence":

1. All sums which the insured, or any company as his insurer, or both, is legally obligated to pay as damages, whether by reason of adjudication or settlement, because of personal injury, property damage or advertising liability to which this policy applies, and

2. All expenses, other than defense settlement provided in Insuring Agreement II, incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only the salaries of the insured's regular employees, provided "ultimate net loss" shall not include any damages or expense because of liability excluded under this policy.

**This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.**

*Id.* at 128, 146, 160. "Occurrence" is defined, in relevant part, as follows:

With respect to Coverage 1(a) and 1(b) "occurrence" means either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at 127-28, 146-47, 160-61.

[5]     In 1983, TCE contamination was discovered at the Lafayette Site. The contamination had been occurring since approximately 1974. The Landis insurance chart for 1973 to 1983 is as follows:



Appellee's Br. p. 17. In short, the Landis entities had $1,000,000 of underlying primary coverage each year, either through Liberty Mutual or Zurich, with millions of dollars of excess/umbrella coverage sitting above, including the North River excess policies in effect from 1976-1978.

[6] It isn't clear when remediation of the Lafayette Site began, but it wasn't complete until 2017. That year, Landis wrote to North River seeking coverage. Landis claimed that the remediation costs totaled approximately $7.6 million. RiverStone, a third-party claims administrator, handled the claim on behalf of North River. In the meantime, Landis reached settlements with Zurich and Liberty Mutual.

[7] Despite extensive communication and document exchange, the claim under the North River policies was never settled. In 2021, Landis filed this suit against North River and RiverStone (collectively, "Defendants"). The complaint stated five claims: (1) "Repudiation of All Contracts by Defendants"; (2) "Breach of Contract"; (3) "Bad Faith"; (4) "Civil Conspiracy and Concert of Action"; and (5) "Declaratory Judgment." Appellants' App. Vol. 2 pp. 39-58.

[8] Defendants filed motions for summary judgment on "Choice of Law" and "Allocation." Appellants' App. Vol. 3 pp. 35-67.[2] As relevant here, they argued:

> (1) the interpretation and application of the North River policies is governed by either Indiana law or New York law;
>
> (2) under Indiana law, because the North River policies include "all sums" language (in the definition of "Ultimate net loss"), North River would have to "pay 'all sums' arising from the contamination" up to policy limits, even though some of the contamination occurred outside the North River policy periods, *see Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001);
>
> (3) under New York law, because the North River policies include "during the policy period" language (in the definition of "Occurrence"), North River would owe nothing because a "pro rata time-on-the-risk allocation model" would apply, the $7.6 million in cleanup costs would be apportioned "across all years of damage," and the resulting costs per year would be less than

---

[2] Defendants filed additional summary-judgment motions that were denied and that we need not address in this opinion.

$1,000,000, which is below the retained limit, or "attachment point," of the North River excess policies;

(4) because different results would be reached under Indiana law and New York law, a choice-of-law analysis is necessary; and

(5) under Indiana's choice-of-law analysis, New York law applies, so no liability should be allocated to the North River policies.

*Id.* On this basis, Defendants requested summary judgment on all of Landis's claims.

In response, Landis argued that the all-sums approach would apply, and Landis would prevail, under either Indiana law or New York law, so no choice-of-law analysis is necessary. Alternatively, Landis argued that even if a choice-of-law analysis were necessary, that analysis calls for the application of Indiana law. Landis also cross-moved for summary judgment "as to coverage," asserting:

There is no dispute of fact that: (1) North River provided property damage liability coverage to Landis; (2) an "occurrence" happened regarding one or more spills of hazardous substances that caused property damage during the North River policy periods; and (3) the State of Indiana imposed liability on Landis by law as a result of such property damage.

Appellants' App. Vol. 9 p. 162. Landis requested an initial judgment of $10,860,423.10 to be followed by a trial on its other claims. It arrived at that figure by adding 8% interest (from some unspecified date or dates) to the $7.6 million in remediation costs, for a total of $17,090,423.10 as of May 11, 2024,

and then applying a credit of $6,230,000 for the settlements with the other insurers ($17,090,423.10-$6,230,000=$10,860,423.10). *Id.* at 163-64.

[10] After hearing oral argument, the trial court, without addressing the parties' specific legal theories, denied Defendants' motions and granted Landis's cross-motion. Accordingly, the court entered an initial judgment of $10,860,423.10 for Landis. Landis's other claims remained pending. Defendants moved, under Indiana Trial Rules 54(B) and 56(C), for the entry of final judgment as to the grant of Landis's cross-motion. The trial court granted that motion, and Defendants now appeal.[3]

## Discussion and Decision

[11] Defendants contend that the trial court erred by granting Landis's cross-motion for summary judgment as to coverage and that summary judgment should instead be ordered for them on all of Landis's claims. We review a motion for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). That is, "The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

---

[3] We held oral argument on April 14, 2026. We thank counsel for their helpful presentations.

[12] Defendants renew their arguments that (1) they would prevail under New York law but Landis would prevail under Indiana law and therefore a choice-of-law analysis is necessary and (2) Indiana's choice-of-law test for contracts leads to the application of New York law. We agree with Defendants on both points. We begin by addressing the conflict of law and then turn to the choice-of-law analysis. *See Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) ("Ordinarily a choice of law issue will be resolved only if it appears there is a difference in the laws of the potentially applicable jurisdictions.").[4]

## I. There is a conflict between Indiana law and New York law

[13] The parties discuss two approaches to determining an insurer's liability for damage or injury that occurs over multiple years and that implicates multiple policies: the "all sums" approach and the "pro rata" approach. These approaches have been generally described as follows:

> Under an "all sums" or a "joint and several" method for allocation, an insured is permitted to collect its total liability under any policy in effect during the periods that the damage

---

[4] Landis argues that North River "repudiated" the policies and is therefore barred from making some or all of its appellate arguments. Appellee's Br. pp. 38-44. The repudiation claim is based primarily on North River (1) entering into a reinsurance agreement and (2) allowing a third party, RiverStone, to administer Landis's claims. The argument is hard to follow, to say the least. Landis begins by briefly addressing the concept of repudiation (i.e., anticipatory breach, *see Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991), *reh'g denied*, *trans. denied*), shifts to the concept of novation (i.e., substituting a new contract for the original contract, *see Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994)), and then discusses a 140-year-old New York decision (*People v. Empire Mut. Life Ins. Co.*, 92 N.Y. 105 (1883)) that says nothing about repudiation or novation. Landis cites no authority holding that entering into a reinsurance agreement and/or allowing a third party to administer a claim amounts to repudiation of an insurance policy. Moreover, Landis offers no response to Defendants' argument that Landis's own experts saw nothing improper about these arrangements. *See* Appellants' Br. pp. 28, 45 n.10. Landis hasn't shown that North River repudiated the policies.

occurred, up to the policy limits. It is then the insurer's burden to seek contribution from the insurers that issued the other triggered policies. In contrast, under the pro rata scheme for allocation, an insurer's liability is limited to sums incurred by the insured during the policy period; in other words, each insurance policy is allocated a pro rata share of the total loss representing the portion of the loss that occurred during the policy period.

*Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 149 (2d Cir. 2017) (citation modified).

The parties agree that because the North River policies include "all sums" language (in the definition of "Ultimate net loss"), the all-sums approach would apply under Indiana law—specifically, *Allstate Insurance Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001)—and North River would be liable. But the parties disagree about New York law. Defendants argue that because the North River policies also include "during the policy period" language (in the definition of "Occurrence"), the pro rata approach would apply under New York law and North River would owe nothing. Defendants' pro rata calculation is as follows: dividing the total remediation costs—approximately $7.6 million—by the number of years of contamination—10 (1974 through 1983)—means about $760,000 of costs are allocable to each year, which is less than $1 million and therefore below the retained limit, or "attachment point," of the North River excess policies. Landis doesn't dispute that calculation but argues that it is irrelevant because the all-sums approach would also apply under New York law, notwithstanding the "during the policy period" language. For the reasons

that follow, we conclude that the pro rata approach would apply under New York law, meaning North River would owe nothing.[5]

[15] As Defendants note, the New York Court of Appeals has held that when a policy has "all sums" language but also "during the policy period" language, the pro rata approach generally applies. *See Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 693-695 (N.Y. 2002). Landis doesn't address that rule or the "during the policy period" language in the North River policies. Instead, it focuses on a subsequent New York Court of Appeals decision, *In re Viking Pump, Inc.*, 52 N.E.3d 1144 (N.Y. 2016). There, the Court held that even where an excess policy includes "during the policy period" language, all-sums allocation applies if the policy also incorporates or contains a "non-cumulation" clause. *Id.* at 1152-56. The Court described non-cumulation clauses as follows:

> Generally, non-cumulation clauses prevent stacking, the situation in which an insured who has suffered a long term or continuous loss which has triggered coverage across more than one policy period wishes to add together the maximum limits of all consecutive policies that have been in place during the period of the loss.

---

[5] While Landis's primary argument is that all-sums allocation would apply under either Indiana law or New York law, it claims at a few points in its brief that, because it has settled with its other insurers, it wins even if the pro rata approach applies (since North River is "the lone insurer remaining"). Appellee's Br. pp. 32, 47-48, 52. Landis doesn't elaborate, so it has waived this argument. *See* Ind. Appellate Rule 46(A)(8)(a) (providing that appellate arguments must be supported by "cogent reasoning" and "citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on").

*Id.* at 1152 (citation modified). The Court explained that such a clause is inconsistent with pro rata allocation:

> Such policy provisions plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence by acknowledging that a covered loss or occurrence may "also be covered in whole or in part under any other excess policy issued to the insured prior to the inception date" of the instant policy.

> By contrast, the very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period—meaning that no two insurance policies, unless containing overlapping or concurrent policy periods, would indemnify the same loss or occurrence. Pro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the "during the policy period" limitation, despite the fact that the injuries may not actually be capable of being confined to specific time periods. The non-cumulation clause negates that premise by presupposing that two policies may be called upon to indemnify the insured for the same loss or occurrence. Indeed, even commentators who have advocated for pro rata allocation and propounded the complications that can be caused by all sums allocation have recognized that non-cumulation clauses cannot logically be applied in a pro rata allocation. In a pro rata allocation, the non-cumulation clauses would, therefore, be rendered surplus-age—a construction that cannot be countenanced under our principles of contract interpretation, and a result that would conflict with our previous recognition that such clauses are enforceable.

*Id.* at 1153-54 (citation modified).

[16]     This holding doesn't help Landis. The North River policies don't incorporate or include non-cumulation clauses. Landis notes that non-cumulation clauses were included in **other** policies issued to the Landis entities for the same years, and it argues that the North River policies should be "read in harmony" with those other policies. Appellee's Br. pp. 47-51. But Landis doesn't cite any authority that supports this proposition, and we agree with Defendants that the language of other policies issued by other insurers shouldn't control the meaning of the North River policies.

[17]     Landis also argues that all-sums allocation would apply under New York law because the "Retained Limit – Limit of Liability" section of the North River policies includes "other insurance collectible" language:

> **V RETAINED LIMIT – LIMIT OF LIABILITY**
>
> With respect to Coverage I(a), I(b) or I(c), or any combination thereof, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
>
> > (a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any **other insurance collectible** by the insured; or
> >
> > (b) an amount as stated in Item 4(C) of the declarations as the result of any one occurrence not covered by the said policies or insurance;
>
> and then up to an amount not exceeding the amount as stated in Item 4(A) of the declarations as the result of any one occurrence.

> There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of the company arising out of the products hazard on account of all occurrences during each policy year shall not exceed the aggregate amount stated in Item 4(B) of the declarations.

> In the event of the reduction or exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limits; or (2) in the event of exhaustion, shall continue in force as underlying insurance.

Appellants' App. Vol. 2 pp. 129, 147, 161 (emphasis added). According to Landis, the *Viking Pump* Court held that an "other insurance" clause, like a non-cumulation clause, is inconsistent with pro rata allocation and instead supports the all-sums approach. Appellee's Br. pp. 50-51. But the *Viking Pump* Court said nothing about "other insurance" clauses in its allocation discussion. 52 N.E.3d at 1149-56. The *Viking Pump* Court did discuss "other insurance" clauses in a subsequent section of its opinion (addressing horizon vs. vertical exhaustion), but it explained that such clauses "apply when two or more policies provide coverage during the same period" and "are not implicated in situations involving successive—as opposed to concurrent—insurance policies[.]" *Id.* at 1157. Since "other insurance" clauses "are not implicated" in situations involving successive insurance policies, we fail to see how they are relevant to determining the appropriate method of allocation among successive policies.

[18] Because the North River policies include "during the policy period" language but don't incorporate or include non-cumulation clauses, pro rata allocation would apply under New York law, and North River would owe nothing. And because this conflicts with the all-sums approach under Indiana law, a choice-of-law analysis is necessary.

## II. Under Indiana's choice-of-law analysis, New York law applies

[19] Landis contends that even if there is a conflict of law, Indiana's choice-of-law analysis for contract cases calls for the application of Indiana law (and the all-sums approach). Our Supreme Court set forth that analysis in *National Union Fire Insurance Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810 (Ind. 2010). In contract cases generally, Indiana courts apply the law of the state in "most intimate contact" with the facts. *Id.* at 814. In making this determination, we look to the contacts listed in Section 188 of the Restatement (Second) of Conflict of Laws: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* Where the contract at issue is an insurance policy, the analysis begins with the fourth contact—"the location of the subject matter of the contract"—which is "the principal location of the insured risk during the term of the policy." *Id.* at 814-16 (citing Section 193 of the Restatement). If the principal location of the insured risk can be determined,

that determination may be dispositive of the choice-of-law analysis, but at the very least it is given more weight than other factors. *Id.* at 816.

[20] To determine the principal location of the insured risk under a multisite, multistate insurance policy, we first look to whether one state has more insured sites than the other state(s). *Id.* (citing *Am. Emps. Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E.2d 1172, 1181 (Ind. Ct. App. 2005)). If so, that state is the principal location of the insured risk. *Id.* If not, we look to other information, such as the "quantitative data" for individual sites and the location of the insured's headquarters. *Id.* Here, there is no dispute that New York had the highest number of insured sites from 1976 to 1978, so New York was the principal location of the insured risk.

[21] The first, second, and fifth Section 188 contacts—the place of contracting, the place of negotiation of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties—also support the application of New York law. Landis was incorporated and headquartered in New York, had a New York insurance broker, and used its New York address on the North River applications. And while North River was incorporated and based in New Jersey, its New York office handled the underwriting and negotiation of the policies.[6]

---

[6] Landis claims that Indiana was the place of contracting and place of negotiation for the North River policies, but the few record cites it provides are either vague or focused on Zurich policies. *See* Appellee's App. Vol. 2 pp. 9-10, 25-27, 53-54, 66-67, 102, 151, 153, 155; Appellee's App. Vol. 5 pp. 38-39. And when

The third Section 188 contact—the place of performance—favors Indiana law. The place of performance of an insurance contract is "the location where the insurance funds will be put to use." *Standard Fusee*, 940 N.E.2d at 817. Here, that is Indiana. That said, the place of performance is given little weight when it was either uncertain or unknown at the time of contracting. *Coachmen Indus.*, 838 N.E.2d at 1180. At the time of contracting, Landis had operations in several locations in the United States and Canada. As a result, the place of performance was uncertain at that time, and this contact is given little weight.

Because four of the five Section 188 contacts favor New York law—including the most important contact, the principal location of the insured risk—and the one contact that favors Indiana isn't entitled to significant weight, we hold that New York law applies. And we held above that, under New York law, pro rata allocation applies and Landis's alleged damages don't reach the North River excess policies. Therefore, we reverse the trial court's grant of Landis's cross-motion for summary judgment as to coverage and remand for the entry of summary judgment for Defendants on all of Landis's claims.

Reversed and remanded.

Mathias, J., and Pyle, J., concur.

---

Landis sued Zurich in relation to this same contamination, the U.S. District Court for the Northern District of Indiana concluded that New York law applied. *See Landis+Gyr Inc. v. Zurich Am. Ins. Co.*, No. 4:16-cv-82, 2019 WL 208758 (N.D. Ind. Jan. 15, 2019).

ATTORNEYS FOR APPELLANTS

Erik Mroz
Elizabeth S. Straw
Drewry Simmons Vornehm, LLP
Carmel, Indiana

Bryan H. Babb
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

John D. LaBarbera
Bevin Carroll
Kennedys Law LLP
Chicago, Illinois


ATTORNEYS FOR APPELLEE

Brent W. Huber
Jenny R. Buchheit
Robert A. Jorczak
Ice Miller LLP
Indianapolis, Indiana