This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------

No. 59
In the Matter of Viking Pump,
Inc. and Warren Pumps, LLC,
Insurance Appeals.
--------------------------------
Viking Pump, Inc. and Warren
Pumps, LLC,
            Appellants,
TIG Insurance Company, et al.,
            Respondents.

            Michael P. Foradas, for appellant Viking Pump, Inc.
            Robin Cohen, for appellant Warren Pumps, LLC.
            Kathleen M. Sullivan, for respondents.
            Complex Insurance Claims Litigation Association et al.;
New York State Electric & Gas Corporation; United Policyholders
et al.; Olin Corporation; ITT Corporation, amici curiae.

STEIN, J.:

        In this complex insurance dispute, we have accepted two
certified questions from the Delaware Supreme Court asking us to
determine (1) whether "all sums" or "pro rata" allocation applies
where the excess insurance policies at issue either follow form
to a non-cumulation provision or contain a non-cumulation and

- 1 -

prior insurance provision, and (2) whether, in light of our answer to the allocation question, horizontal or vertical exhaustion is required before certain upper level excess policies attach.  We reaffirm that, under New York law, the contract language of the applicable insurance policies controls each of these questions, and we answer the certified questions in accordance with the opinion herein, concluding that all sums allocation and vertical exhaustion apply based on the language in the policies before us.

I.

The facts and procedural history of the underlying litigation are explained in more detail in decisions of the Delaware courts (see In re Viking Pump, Inc., ___ A3d ___, ___, 2015 WL 3618924, 2015 Del LEXIS 278 [Del June 10, 2015]; Viking Pump, Inc. v Century Indem. Co., 2014 WL 1305003, 2014 Del Super LEXIS 707 [Del Super Feb. 28, 2014]; Viking Pump, Inc. v Century Indem. Co., 2013 WL 7098824, 2013 Del Super LEXIS 615 [Del Super Oct. 31, 2013]; Viking Pump, Inc. v Century Indem. Co., 2 A3d 76 [Del Ch 2009]).  As relevant here, Viking Pumps, Inc., and Warren Pumps, LLC, acquired pump manufacturing businesses from Houdaille Industries in the 1980s.  Those acquisitions later subjected Viking and Warren to significant potential liability in connection with asbestos exposure claims.  Houdaille had extensive multi-layer insurance coverage spanning from 1972 to 1985 that included coverage for such claims.  More specifically,

Liberty Mutual Insurance Company provided Houdaille with primary

insurance (totaling approximately $17.5 million) and umbrella

excess coverage (totaling approximately $42 million) through

successive annual policies.  Beyond that, Houdaille obtained

additional layers of excess insurance through annual policies

issued by various excess insurers (totaling over $400 million in

coverage), including a number of policies issued by defendants,

designated herein as "the Excess Insurers."

Viking and Warren sought coverage under the Liberty

Mutual policies, and the Delaware Court of Chancery determined

that both companies were entitled to exercise rights as insureds

under those policies (see generally Viking Pump, Inc. v Liberty

Mut. Ins. Co., 2007 WL 1207107, 2007 Del Ch LEXIS 43 [Del Ch Apr

2, 2007]).  As the Liberty Mutual coverage neared exhaustion,

litigation arose regarding whether Viking and Warren were

entitled to coverage under the additional excess policies issued

to Houdaille by the Excess Insurers and, if so, how indemnity

should be allocated across the triggered policy periods.

Central to the underlying litigation, the Liberty

Mutual umbrella policies provide that the insurer

> "will pay on behalf of the insured all sums
> in excess of the retained limit which the
> insured shall become legally obligated to
> pay, or with the consent of [the Insurer],
> agrees to pay, as damages, direct or
> consequential, because of: (a) personal
> injury . . . with respect to which this
> policy applies and caused by an occurrence"
> (emphasis added).

"Occurrence" is defined, in relevant part, as "injurious exposure to conditions, which results in personal injury" which, in turn, is defined as "personal injury or bodily injury which occurs during the policy period" (emphasis added).  The policies also state that, "[f]or the purpose of determining the limits of [the Insured's liability]: (1) all personal injury . . . arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered as the result of one and the same occurrence."  The excess policies issued by the Excess Insurers either follow form to (i.e., incorporate) these provisions, or provide for substantively identical coverage.

The majority of the excess policies at issue also follow form to a "non-cumulation" of liability or "anti-stacking" provision in the Liberty Mutual umbrella policies, which provides that

> "[i]f the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs partly before and partly within any annual period of this policy, the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by [Liberty Mutual] with respect to such occurrence, either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof."

Those excess policies that do not follow form to the Liberty Mutual non-cumulation provision, contain a similar two-part "Prior Insurance and Non[-]Cumulation of Liability" provision,

sometimes referred to as "Condition C," as follows:

> "It is agreed that if any loss covered
> hereunder is also covered in whole or in part
> under any other excess Policy issued to the
> [Insured] prior to the inception date
> hereof[,] the limit of liability hereon . . .
> shall be reduced by any amounts due to the
> [Insured] on account of such loss under such
> prior insurance.
>
> Subject to the foregoing paragraph and to all
> the other terms and conditions of this Policy
> in the event that personal injury or property
> damage arising out of an occurrence covered
> hereunder is continuing at the time of
> termination of this Policy the Company will
> continue to protect the [Insured] for
> liability in respect of such personal injury
> or property damage without payment of
> additional premium."

In the underlying litigation, the parties cross-moved for summary judgment with respect to the availability of coverage and the allocation of liability under the excess policies. The Delaware Court of Chancery granted Viking and Warren summary judgment on those issues, and denied the Excess Insurers' cross motions (2 A3d at 130). As a threshold matter, the Court of Chancery held that New York law applied to the dispute and that Viking and Warren were each entitled to coverage under the excess policies (see id. at 90).[1]

With regard to the allocation issue, the Court of Chancery agreed with Warren and Viking (hereinafter, collectively, "the Insureds") that the proper method of allocation was the all sums approach, as compared with the pro

---

[1] Neither of those holdings is before us.

rata allocation method propounded by the Excess Insurers (see id. at 119-127). The Court of Chancery acknowledged that this Court had previously applied the pro rata method in Consolidated Edison Co. of N.Y. v Allstate Ins. Co. (98 NY2d 208, 222 [2002]), where the policy language similarly provided that the insurer would pay "all sums" for an occurrence happening "during the policy period" (see 2 A3d at 120-121). However, the Court of Chancery distinguished the policy language at issue here from that interpreted in Consolidated Edison on the ground that the non-cumulation and prior insurance provisions in the policies here evinced a clear and unambiguous intent to use all sums allocation (see id. at 119-127). The Court of Chancery rejected the argument of the Excess Insurers that these provisions would not apply if liability was apportioned on a pro rata basis because, according to that court, such an interpretation would -- contrary to New York principles of contract interpretation -- render the non-cumulation and prior insurance provisions surplusage (see id. at 124-126). The Court of Chancery also observed that, even if the policy language was ambiguous, "the only substantial extrinsic evidence offered by the parties weighs in favor of the use of the all sums method" because, the court asserted, Liberty Mutual had, in the past, routinely allocated its liability under its own policies -- to which the excess policies followed form -- in accordance with the all sums method (id. at 119, 127-129). The Court of Chancery further noted that,

to the extent the policies are ambiguous, any ambiguity must be resolved in favor of the Insureds (see id. at 129-130).

The matter was transferred to the Delaware Superior Court (2010 WL 2989690 [Del Ch June 2010]), where a trial was ultimately held (2013 WL 7098824, at *6-7, 2013 Del Super LEXIS 615, *21-22). A verdict was returned largely in the Insureds' favor, and the parties made post-judgment motions. As relevant here, the Superior Court rejected the Excess Insurers' renewed arguments that pro rata allocation applied. The Superior Court also determined that, as a matter of New York law, the Insureds were obligated to horizontally exhaust (i.e., deplete) every triggered primary and umbrella layer of insurance before accessing the excess policies. While the Superior Court agreed with the Insureds that policy language supported vertical exhaustion, in the court's view, New York law required that horizontal exhaustion be utilized with respect to primary and umbrella policies.[2]

On appeal, the Delaware Supreme Court concluded that resolution of the allocation and exhaustion disputes between the Excess Insurers and the Insureds "depends on significant and unsettled questions of New York law that have not been answered,

---

[2] The Superior Court subsequently limited that ruling to the primary/umbrella layers, holding that horizontal exhaustion did not apply among additional layers of excess coverage (see Viking Pump, Inc. v Century Indem. Co., 2014 WL 1305003, 2014 Del Super LEXIS 707 [Del Super Feb. 28, 2014]). The propriety of that holding is not before us.

in the first instance, by the New York Court of Appeals" (\_\_\_ A3d

\_\_\_, \_\_\_, 2015 WL 3618924, at *2, 2015 Del LEXIS 278, at *9-10).

Therefore, the Delaware Supreme Court certified, and we accepted,

the following questions:

> "1. Under New York law, is the proper method
> of allocation to be used all sums or pro rata
> when there are non-cumulation and prior
> insurance provisions?
>
> 2. Given the Court's answer to Question # 1,
> under New York law and based on the policy
> language at issue here, when the underlying
> primary and umbrella insurance in the same
> policy period has been exhausted, does
> vertical or horizontal exhaustion apply to
> determine when a policyholder may access its
> excess insurance?"

(id. 2015 WL 3618924, at *3, 2015 Del LEXIS 278, at *10; see

Matter of Viking Pump, Inc., 25 NY3d 1188 [2015]).

## II.  Allocation

### (A)

Courts across the country have grappled with so-called

"long-tail" claims -- such as those seeking to recover for

personal injuries due to toxic exposure and property damage

resulting from gradual or continuing environmental contaminations

-- in the insurance context.  These types of claims present

unique complications because they often involve exposure to an

injury-inducing harm over the course of multiple policy periods,

spawning litigation over which policies are triggered in the

first instance, how liability should be allocated among triggered

policies and the respective insurers, and at what point insureds

may turn to excess insurance for coverage.  Given the particular

certified questions presented here, we are not asked to review

the Delaware courts' rulings regarding which policies were

triggered and upon what events such triggering occurred, and we

do not pass on those issues here.[3]  Rather, we consider only the

allocation and exhaustion issues, and we first address the

question of allocation.

The Insureds argue that the losses should be allocated

through a "joint and several" or "all sums" method.  This theory

of allocation "permits the insured to 'collect its total

liability . . . under any policy in effect during' the periods

that the damage occurred," up to the policy limits (Roman

Catholic Diocese of Brooklyn v National Union Fire Ins. Co. of

Pittsburgh, Pa., 21 NY3d at 154, quoting Consolidated Edison, 98

NY2d 208, 222 [2002]; see United States Fid. & Guar. Co. v

American Re-Ins. Co., 20 NY3d 407, 426 [2013]).  The burden is

then on the insurer against whom the insured recovers to seek

contribution from the insurers that issued the other triggered

policies (see Consolidated Edison, 98 NY2d at 222).

The Excess Insurers, by contrast, advocate for pro rata

---

[3]  After the Delaware Court of Chancery held that the
policies were triggered upon an injury-in-fact that occurred upon
asbestos exposure (2 A3d 76, 110-111 [Del Ch 2009]), the trigger
issue was litigated at trial, and the Superior Court declined to
alter the jury's verdict on this point (see 2013 WL 7098824, at
*17-18, 2013 Del Super LEXIS 615, *55-58 [Del Super Oct. 31,
2013]).

allocation.  Under this method, an insurer's liability is limited
to sums incurred by the insured during the policy period; in
other words, each insurance policy is allocated a "pro rata"
share of the total loss representing the portion of the loss that
occurred during the policy period (see Roman Catholic Diocese of
Brooklyn, 21 NY3d at 154; Consolidated Edison, 98 NY2d at 223).[4]
Generally, "[p]roration of liability among the insurers
acknowledges the fact that there is uncertainty as to what
actually transpired during any particular policy period" in
claims alleging a gradual and continuing harm (Consolidated
Edison, 98 NY2d at 224).

Courts of different states and federal jurisdictions
are divided on the issue of allocation in relation to long-tail
claims.  Some jurisdictions have expressed a preference for the
all sums method, usually relying on language in policies
obligating an insurer to pay "all sums" for which an insured
becomes liable (see e.g. State of California v Cont. Ins. Co., 55
Cal 4th 186, 199, 281 P3d 1000, 1007 [2012], as mod [Sept. 19,
2012]; Plastics Eng'g Co. v Liberty Mut. Ins. Co., 315 Wis 2d
556, 583, 759 NW2d 613, 626 [2009]; Goodyear Tire & Rubber Co. v
Aetna Cas. & Sur. Co., 95 Ohio St 3d 512, 515, 769 NE2d 835, 840
[2002]; Hercules, Inc. v AIU Ins. Co., 784 A2d 481, 491 [Del

---

[4] Courts have devised different methods of fixing losses
between policy periods (see Consolidated Edison Co. of N.Y. v
Allstate Ins. Co., 98 NY2d 208, 224-225 [2002]).  Again, we have
no occasion to discuss these methods in this case.

2001]; American Physicians Ins. Exch. v Garcia, 876 SW2d 842, 855
[Tex 1994]; J.H. France Refractories Co. v Allstate Ins. Co., 534
Pa 29, 39, 626 A2d 502, 507 [1993]; Keene Corp. v Ins. Co. of N.
Am., 667 F2d 1034, 1047 [DC Cir 1981]).  Others have, instead,
utilized the pro rata method, emphasizing language in the
insurance policies that may be interpreted as limiting the "all
sums" owed to those resulting from an occurrence "during the
policy period," or public policy reasons supporting pro rata
allocation, or a combination of the two (see e.g. EnergyNorth
Nat. Gas, Inc. v Certain Underwriters at Lloyd's, 156 NH 333,
344, 934 A2d 517, 526 [2007]; Public Serv. Co. of Colorado v
Wallis and Cos, 986 P2d 924, 940 [Colo 1999]; Owens-Illinois,
Inc. v United Ins. Co., 138 NJ 437, 473, 650 A2d 974, 992 [1994];
Insurance Co. of N. Am. v Forty-Eight Insulations, Inc., 633 F2d
1212, 1225 [6th Cir 1980], decision clarified on reh, 657 F2d 814
[6th Cir 1981], cert denied 454 US 1109 [1981]).

          We first confronted the question of pro rata versus all
sums allocation in Consolidated Edison (98 NY2d at 222).  In that
case, we applied the pro rata method to claims involving
environmental contamination over a number of years and insurance
policy periods.  Significantly, we did not reach our conclusion
in Consolidated Edison by adopting a blanket rule, based on
policy concerns, that pro rata allocation was always the
appropriate method of dividing indemnity among successive
insurance policies.  Rather, we relied on our general principles

of contract interpretation, and made clear that the contract language controls the question of allocation.

We emphasized in Consolidated Edison, and have reiterated thereafter, that "'[i]n determining a dispute over insurance coverage, [courts] first look to the language of the policy'" (Roman Catholic Diocese of Brooklyn, 21 NY3d at 148, quoting Consolidated Edison, 98 NY2d at 221; see Selective Ins. Co. of Am. v County of Rensselaer, 26 NY3d 649, 655 [2016]). We did not adopt a strict rule mandating either pro rata or all sums allocation because insurance contracts, like other agreements, should "be enforced as written," and "parties to an insurance arrangement may generally 'contract as they wish and the courts will enforce their agreements without passing on the substance of them'" (J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 [2013], quoting New England Mut. Life Ins. Co. V Caruso, 73 NY2d 74, 81 [1989]).

When construing insurance policies, the language of the "contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured" (Dean v Tower Ins. Co. of N.Y., 19 NY3d 704, 708 [2012], quoting Cragg v Allstate Indem. Corp., 17 NY3d 118, 122 [2011]). Furthermore, "we must construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect" (Roman Catholic Diocese of Brooklyn, 21 NY3d at 148 [internal

quotation marks and citations omitted]).  Significantly,
"surplusage[ is] a result to be avoided" (Westview Assoc. v
Guaranty Natl. Ins. Co., 95 NY2d 334, 339 [2000]).  Moreover,
while "'[a]mbiguities in an insurance policy are to be construed
against the insurer'" (Dean, 19 NY3d at 708, quoting Breed v
Insurance Co. of N. Am., 46 NY2d 351, 353 [1978]; see Federal
Ins. Co. v International Bus. Machs. Corp., 18 NY3d 642, 650
[2012]), a contract is not ambiguous "if the language it uses has
a definite and precise meaning, unattended by danger of
misconception in the purport of the [agreement] itself, and
concerning which there is no reasonable basis for a difference of
opinion" (Selective Ins. Co. of Am., 26 NY3d at 655 [internal
quotation marks and citation omitted]).

        In Consolidated Edison, we applied the foregoing
principles to the parties' arguments in support of, and in
opposition to, pro rata allocation.  The arguments presented in
that case, and our resulting decision, turned exclusively upon
the interpretation of two phrases in the insurance policies that
were before us: (1) that an insurer agreed to indemnify the
insured for "all sums" for which the insured was liable and which
were caused by or arose out of an "occurrence;" and (2) that the
"policies provide[d] indemnification for liability incurred as a
result of an accident or occurrence during the policy period, not
outside that period" (Consolidated Edison, 98 NY2d at 224
[emphasis added]).  The Court concluded that "[p]ro rata

allocation under th[o]se facts, <u>while not explicitly mandated by
the policies</u>, [was] consistent with the language of the
policies," whereas the mere use of the phrase "all sums" was
insufficient to establish a contrary view (98 NY2d at 224
[emphasis added]).  To be sure, we also suggested that, in the
absence of language weighing in favor of a different conclusion,
pro rata allocation was the preferable method of allocation in
long-tail claims in light of the inherent difficulty of tying
specific injuries to particular policy periods.  Nevertheless, we
recognized that "different policy language" might compel all sums
allocation (98 NY2d at 223), citing, as a point of comparison, to
the Delaware Supreme Court's decision in <u>Hercules, Inc. v AIU
Ins. Co.</u>, wherein the Delaware Court adopted the all sums method
(784 A2d 481).

The policy language at issue here, by inclusion of the
non-cumulation clauses and the two-part non-cumulation and prior
insurance provisions, is substantively distinguishable from the
language that we interpreted in <u>Consolidated Edison</u>, and the
arguments that were made to us in that case were, likewise,
different.[5]  Indeed, the excess policies before us here present
the very type of language that we signaled might compel all sums
allocation in <u>Consolidated Edison</u>.  Inasmuch as the question is
now squarely before us, we must determine whether the presence of

_____

[5]  While such provisions were included in some of the
policies at issue in <u>Consolidated Edison</u>, there was no reference
in our decision to their existence.

a non-cumulation clause or a non-cumulation and prior insurance
provision mandates all sums allocation.

(B)

Generally, non-cumulation clauses prevent stacking, the
situation in which "an insured who has suffered a long term or
continuous loss which has triggered coverage across more than one
policy period . . . wishes to add together the maximum limits of
all consecutive policies that have been in place during the
period of the loss" (12 Couch on Ins. § 169:5 [3d ed]; see Barry
R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage
Disputes § 11.02 [e] [16th ed 2013]).  Such clauses originated
during the shift from "accident-based" to "occurrence-based"
liability policies in the 1960s and 1970s, and were purportedly
designed to prevent any attempt by policyholders to recover under
a subsequent policy -- based on the broader definition of
occurrence -- for a loss that had already been covered by the
prior "accident-based" policy (see Jan M. Michaels et al., The
"Non-Cumulation" Clause: Policyholders Cannot Have Their Cake and
Eat It Too, 61 U Kan L Rev 701, 717 [2013]; Christopher C.
French, The "Non-Cumulation Clause": An "Other Insurance" Clause
by Another Name, 60 U Kan L Rev 375, 386 [2011]).  More recently,
courts have been called upon to analyze the impact of these
clauses on the allocation question.  Significantly, we have
enforced non-cumulation clauses in accordance with their plain
language (see Nesmith v Allstate Ins. Co., 24 NY3d 520, 523

[2014]; Hiraldo v Allstate Ins. Co., 5 NY3d 508, 513 [2005]),

despite the limiting impact that such clauses may have on an

insured's recovery (and, by extension, that of an injured

plaintiff).  However, we have never addressed the interplay

between non-cumulation/prior insurance provisions and allocation.

Courts in other states that have addressed this issue

-- both those that have adopted all sums allocation and a few

that have followed a pro rata approach -- have concluded that

non-cumulation clauses cannot be reconciled with pro rata

allocation.  For example, in Chicago Bridge & Iron Co. v Certain

Underwriters at Lloyd's, London, a Massachusetts appellate court

rejected pro rata allocation, in part, on the ground that the

non-cumulation/prior insurance provision "would be superfluous

had the drafter intended that damages would be allocated among

insurers based on their respective time on the risk" (59 Mass App

Ct 646, 656, 797 NE2d 434, 441 [Mass App Ct 2003]).  Similarly,

the Supreme Court of Wisconsin supported its determination that

all sums allocation applied by pointing to non-cumulation clauses

contemplating indemnity where an injury occurs "'partly before

and partly within the policy period'" (Plastics Eng'g Co., 315

Wis 2d at 583, 759 NW2d at 626; see also Riley v United Services

Auto. Ass'n, 161 Md App 573, 592, 871 A2d 599, 611 [Md Ct Spec

App 2005] [noting that prohibiting stacking would run counter to

pro rata allocation], affd 393 Md 55, 899 A2d 819 [2006]).

In addition, at least two courts in jurisdictions that

have adopted the pro rata allocation method, have held that non-cumulation clauses cannot be enforced in conjunction with that method (see Spaulding Composites Co., Inc. v Aetna Cas. and Sur. Co., 176 NJ 25, 44-46, 819 A2d 410, 422-423 [2003]; Outboard Marine Corp. v. Liberty Mut. Ins. Co., 283 Ill App 3d 630, 219 Ill Dec 62, 670 NE2d 740 [1996], appeal denied 169 Ill 2d 570, 221 Ill Dec 439, 675 NE2d 634 [1996] [declining to enforce non-cumulation clause with pro rata allocation]).  In Spaulding Composites Co., Inc. v Aetna Cas. and Sur. Co., the New Jersey Supreme Court explained that, "even if the non-cumulation clause was not facially inapplicable, . . . it would thwart the . . . pro-rata allocation modality" (176 NJ at 44, 819 A2d at 422).  That Court reasoned that,

> "[o]nce the court turns to pro rata
> allocation, it makes sense that the
> non-cumulation clause, which would allow the
> insurer to avoid its fair share of
> responsibility, drops out of the policy
> . . . .  The pro-rata sharing methodology
> has, at its core, a public policy that favors
> maximizing, in a fair and just manner,
> insurance coverage for cleanup of
> environmental disasters.  By applying the
> non-cumulation clause, insurers who were
> actually 'on the risk' would be insulated
> from their fair share of liability. . . ."

(id. at 44-45; see 15 Couch on Ins. § 220:30 [3d ed 1999] ["Once a court has determined that a loss is to be shared among sequential insurers on a pro rata basis, 'prior insurance' and 'non[-]cumulation of liability' clauses in the policies become unenforceable"]).

These cases are persuasive authority for the proposition that, in policies containing non-cumulation clauses or non-cumulation and prior insurance provisions, such as the excess policies before us, all sums is the appropriate allocation method. We agree that it would be inconsistent with the language of the non-cumulation clauses to use pro rata allocation here. Such policy provisions plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence by acknowledging that a covered loss or occurrence may "also [be] covered in whole or in part under any other excess [p]olicy issued to the [Insured] prior to the inception date" of the instant policy.

By contrast, the very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period -- meaning that no two insurance policies, unless containing overlapping or concurrent policy periods, would indemnify the same loss or occurrence. Pro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the "during the policy period" limitation, despite the fact that the injuries may not actually be capable of being confined to specific time periods. The non-cumulation clause negates that premise by presupposing that two policies may be called upon to indemnify the insured for the same loss or occurrence. Indeed, even commentators who have advocated

for pro rata allocation and propounded the complications that can
be caused by all sums allocation have recognized that
non-cumulation clauses cannot logically be applied in a pro rata
allocation (see Jan M. Michaels et al., The Avoidable Evils of
"All Sums" Liability for Long-Tail Insurance Coverage Claims, 64
U Kan L Rev 467, 489 [2015] ["Provisions such as the
non-cumulation clause [do] not even apply and need not be
analyzed under pro rata allocation"]).  In a pro rata allocation,
the non-cumulation clauses would, therefore, be rendered
surplusage -- a construction that cannot be countenanced under
our principles of contract interpretation (see Roman Catholic
Diocese of Brooklyn, 21 NY3d at 148; Consolidated Edison, 98 NY2d
at 221-222; Westview Assoc., 95 NY2d at 339), and a result that
would conflict with our previous recognition that such clauses
are enforceable (see Nesmith, 24 NY3d at 523; Hiraldo, 5 NY3d at
513).[6]

Several of the excess policies here also contain
continuing coverage clauses within the non-cumulation and prior

---

[6] Notably, the Insurers originally argued to the Delaware
courts that the non-cumulation clauses should not be given effect
in a pro rata allocation.  Apparently recognizing that this would
conflict with our principles of contract interpretation -- as the
Delaware Court of Chancery concluded -- the Insurers now take the
position that the non-cumulation clauses can be given effect with
pro rata allocation.  Indeed, according to the Delaware Superior
Court, even the Excess Insurers' own witness, an insurance law
professor, conceded that non-cumulation clauses were inconsistent
with pro rata allocation (see 2013 WL 7098824, at *12, 2013 Del
Super LEXIS 615, at *39).

insurance provisions, reinforcing our conclusion that all sums --
not pro rata -- allocation was intended in such policies.  The
continuing coverage clause expressly extends a policy's
protections beyond the policy period for continuing injuries.
Yet, under a pro rata allocation, no policy covers a loss that
began during a particular policy period and continued after
termination of that period because that subsequent loss would be
apportioned to the next policy period as its pro rata share.
Using the pro rata allocation would, therefore, render the
continuing coverage clause irrelevant.  Thus, presence of that
clause in the respective policies further compels an
interpretation in favor of all sums allocation (see Hercules,
Inc., 784 A2d at 493-494; Dow Corning Corp. v Cont. Cas. Co.,
Inc., 1999 WL 33435067, at *7, 1999 Mich App LEXIS 2920, at *23-
24 [Mich Ct App Oct. 12, 1999], lv denied 463 Mich 854, 617 NW2d
554 [2000]; Boston Gas Co. v Century Indem. Co., 454 Mass 337,
362, 910 NE2d 290, 309 [2009]; Liberty Mut. Ins. Co. v Those
Certain Underwriters at Lloyds, 650 F Supp 1553, 1559 [WD Pa
1987]).

The Excess Insurers contend that a conclusion that all
sums allocation is required would be inconsistent with the Second
Circuit's holding in Olin Corp. v Am. Home Assur. Co. (704 F3d
89, 95 [2d Cir 2012] [Olin III]) and those cases that have
followed in its stead (see Liberty Mut. Ins. Co. v Fairbanks Co.,
2016 WL 1169511, *7, 2016 US Dist LEXIS 36662, at *22 [SD NY

2016]; Liberty Mut. Fire Ins. Co. v J&S Supply Corp., 2015 US Dist LEXIS 177124, *24-25 [SD NY 2015]).  We discern no such impediment to our holding.

In Olin I, the Second Circuit held that pro rata allocation applied to distribute the insured's liability to insurance policies triggered by soil and groundwater contamination resulting from Olin Corporation's pesticide manufacturing operations (see Olin Corp. v Ins. Co. of N. Am., 221 F3d 307 [2d Cir 2000] [Olin I]).  There, the Second Circuit relied both on public policy reasons supporting pro rata allocation, and on language in the insurance policies limiting the scope of coverage to damages incurred during the policy period (see id. at 324-326).  In a later appeal in additional related litigation (see Olin Corp. v Certain Underwriters at Lloyd's London, 468 F3d 120, 127 [2d Cir 2006] [Olin II]), the Second Circuit reaffirmed that its conclusion was consistent with our decision in Consolidated Edison.

Subsequently, in Olin III, the issue on appeal in related litigation against one of Olin's excess insurance carriers was whether the attachment point (i.e., the point at which the insured's liability triggers excess coverage) for two excess policies had been met (704 F3d at 93-95).  Applying strict pro rata allocation to the underlying policies, as provided for in Olin I, the attachment point for the two excess insurance policies was not reached (see id. at 95).  The parties' arguments

in Olin III centered upon the "Prior Insurance and Non-Cumulation of Liability" provision in the underlying policies to which the excess policies followed form (id. at 94), which had not been raised in Olin I or Olin II (see id. at 98). Olin argued that, although pro rata allocation applied under the Second Circuit's earlier holding in Olin I, the continuing coverage clause contained in the non-cumulation/prior insurance provision required that the losses allocated to subsequent years be swept back into the policy periods covering the earlier years. The excess insurer, by contrast, argued, as relevant here, that pro rata allocation was inconsistent with the non-cumulation and continuing coverage clauses and, consequently, those provisions could not be enforced in conjunction with pro rata allocation.

The Second Circuit held that the plain language of the continuing coverage clause of the prior insurance provision "require[d] the insurer to indemnify the insured for personal injury or property damage continuing after the termination of the policy" (id. at 100). The court, therefore, divided up the damages for each year as if allocating them on a pro rata basis, but then swept the shares attributable to the years outside the policy period back into the earlier policy periods.

At first glance, the Second Circuit's decision in Olin III could be viewed as harmonizing the non-cumulation and prior insurance provision containing the continuing coverage clause with pro rata allocation. However, the Court's rejection of the

insurer's argument that these provisions were inconsistent with pro rata allocation turned on its conclusion that "New York state court decisions and those prior decisions of this Court endorsing the pro rata approach foreclose [the Court] from interpreting [the non-cumulation and prior insurance provision] as imposing joint and several liability" (id. at 102).  As discussed above, our holding in Consolidated Edison does not require pro rata allocation in the face of policy language undermining the very premise upon which the imposition of pro rata allocation rests. In light of the Second Circuit's view that it was foreclosed from utilizing all sums allocation -- either by Consolidated Edison or by its own earlier holding in Olin I imposing pro rata allocation -- and the fact that the resulting allocation apportioning numerous years of liability outside the policy period to the relevant policies closely resembles an all sums allocation, the Excess Insurers' contention that Olin III supports a pro rata allocation here is unavailing.  Nor have those courts that have followed Olin III reconciled the language of the non-cumulation clause and prior insurance provision with pro rata allocation (see Liberty Mut. Ins. Co. v Fairbanks Co., 2016 US Dist LEXIS 36662, at *22; Liberty Mut. Fire Ins. Co v J&S Supply Corp, 2016 WL 1169511, at *7, 2015 US Dist LEXIS 177124, at *24-25). Indeed, the Excess Insurers have cited to no authorities satisfactorily reconciling non-cumulation clauses with pro rata allocation.

Accordingly, based on the policy language and the persuasive authority holding that pro rata allocation is inconsistent with non-cumulation and non-cumulation/prior insurance provisions, we hold that all sums allocation is appropriate in policies containing such provisions, like the ones at issue here.

### III.  Exhaustion

With the allocation issue resolved, we turn to the second question -- namely, whether horizontal or vertical exhaustion applies under the relevant policies.  That is, we must determine whether the Insureds are required under the terms of the excess policies to "horizontally" exhaust all triggered primary and umbrella excess layers before tapping into any of the additional excess insurance policies, or whether the Insureds need only "vertically" exhaust the primary and umbrella policies, which would allow the Insureds to access each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted.  The Excess Insurers argue that, if we utilize all sums allocation, then horizontal exhaustion should be applied.[7]

---

[7]  While, in some situations, horizontal exhaustion may be beneficial to excess insurers, particularly where the underlying layers of insurance contain a non-cumulation clause, we note that -- like with the allocation issue -- neither method necessarily militates in favor of insurers or insureds, with much depending on the specifics of the underlying policies and their limits.

All of the excess policies at issue primarily hinge their attachment on the exhaustion of underlying policies that cover the same policy period as the overlying excess policy, and that are specifically identified by either name, policy number, or policy limit.  In our view, vertical exhaustion is more consistent than horizontal exhaustion with this language tying attachment of the excess policies specifically to identified policies that span the same policy period.  Further, vertical exhaustion is conceptually consistent with an all sums allocation, permitting the Insured to seek coverage through the layers of insurance available for a specific year (see Westport Ins. Corp. v Appleton Papers Inc., 327 Wis 2d 120, 168-169, 787 NW2d 894, 919 [2010], review denied 329 Wis 2d 63 [2010]; Cadet Mfg. Co. v Am. Ins. Co., 391 F Supp 2d 884, 892 [WD Wash 2005]; J. Stephen Berry, Jerry B. McNally, Allocation of Insurance Coverage: Prevailing Theories and Practical Applications, 42 Tort Trial & Ins Prac LJ 999, 1015-1016 [2007]).

The only argument of the Excess Insurers in support of horizontal exhaustion that merits discussion is their contention that it is compelled by the "other insurance" clauses in the Liberty Mutual umbrella policies and the subject excess policies. The Liberty Mutual umbrella policies provide that the insurer will pay "all sums in excess of the retained limit," which is defined as the relevant limit of liability of underlying policies, "plus all amounts payable under other insurance, if

any."  An "underlying policy" is "a policy listed as an underlying policy in the declarations," which, as already stated, includes only policies spanning the same policy period as the respective excess policy.  Other insurance, in turn, "means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy."  The excess policies have similar clauses providing for such policies to be excess to other insurance.

The Excess Insurers contend that the "other insurance" available to the Insureds includes coverage provided by successive insurance policies.  Their argument in this regard is not completely baseless (see Dow Corning Corp., 1999 WL 33435067, at *9, 1999 Mich App LEXIS 2920, at *26-29; United States Gypsum Co. v Admiral Ins. Co., 268 Ill App 3d 598, 653, 643 NE2d 1226, 1261 [Ill App Ct 1994], lv denied 161 Ill 2d 542 [1995]).  However, we stated in Consolidated Edison that "other insurance" clauses "apply when two or more policies provide coverage during the same period, and they serve to prevent multiple recoveries from such policies," and that such clauses "have nothing to do" with "whether any coverage potentially exist[s] at all among certain high-level policies that were in force during successive years" (Consolidated Edison, 98 NY2d at 223 [emphases added]).  Those cases relied on by the Delaware Superior Court do not hold otherwise because they each involved instances of concurrent

insurance policies (see e.g. American Home Assur. Co. v
International Ins. Co., 90 NY2d 433, 437 [1997]; State Farm Fire
& Cas. Co. v LiMauro, 65 NY2d 369, 372 [1985]; Lumbermens Mut.
Cas. Co. v Allstate Ins. Co., 51 NY2d 651 [1980]; Bovis Lend
Lease LMB, Inc. v Great Am. Ins. Co., 53 AD3d 140 [1st Dept
2008]).  Moreover, our conclusion in Consolidated Edison that
other insurance clauses are not implicated in situations
involving successive -- as opposed to concurrent -- insurance
policies finds support in other jurisdictions (see Ohio Cas. Ins.
Co. v Unigard Ins. Co., 268 P3d 180, 184 [2012]; Century Indem.
Co. v Liberty Mut. Ins. Co., 815 F Supp 2d 508, 516 [DRI 2011];
Westport Ins. Corp., 327 Wis 2d at 168-169, 787 NW2d at 919;
Boston Gas Co., 454 Mass at 361, 910 NE2d at 308 [the 'other
insurance' clauses simply reflect a recognition of the many
situations in which concurrent, not successive, coverage would
exist for the same loss]; LSG Tech., Inc. v U.S. Fire Ins. Co.,
2010 WL 5646054, at *12, 2010 US Dist Lexis 140879 [ED Tex Sept.
2, 2010]; Owens-Illinois, Inc. v United Ins. Co., 138 NJ 437,
470, 650 A2d 974, 991 [1994]).

Here, the Insureds are not seeking multiple recoveries
from different insurers under concurrent policies for the same
loss, and the other insurance clause does not apply to successive
insurance policies (see Consolidated Edison, 98 NY2d at 223).
Thus, in light of the language in the excess policies tying their
attachment only to specific underlying policies in effect during

the same policy period as the applicable excess policy, and the absence of any policy language suggesting a contrary intent, we conclude that the excess policies are triggered by vertical exhaustion of the underlying available coverage within the same policy period (see United States Fid. & Guar. Co. v American Re-Ins. Co., 20 NY3d at 428; Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes § 13.14).

IV.

Accordingly, following certification of questions by the Supreme Court of Delaware and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, the certified questions should be answered in accordance with this opinion.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Following certification of questions by the Supreme Court of Delaware and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein. Opinion by Judge Stein. Chief Judge DiFiore and Judges Pigott, Rivera, Abdus-Salaam and Fahey concur. Judge Garcia took no part.

Decided May 3, 2016